## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**IN RE: AMY BEARD, Debtor**                                  **No. 4:15-bk-14308**
                                                                            **Ch. 7**

**UNITED STATES TRUSTEE**                                      **PLAINTIFF**

**v.**                              **4:15-ap-1112**

**AMY BEARD**                                                 **DEFENDANT**

**FREDERICK S. WETZEL, III**                                  **PLAINTIFF**

**v.**                              **4:16-ap-1001**

**AMY BEARD AND PAUL BUCH**                                   **DEFENDANTS**


### ORDER AND OPINION

On December 10, 2015, the United States Trustee [the UST] filed adversary proceeding 4:15-ap-1112, seeking the denial of the debtor's chapter 7 discharge under 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A).[1]  On January 6, 2016, the debtor filed her answer to the UST's complaint.  On January 8, 2016, chapter 7 trustee Frederick S. Wetzel, III [Wetzel] filed adversary proceeding 4:16-ap-1001 against the debtor and Paul Buch [Buch], alleging that the debtor fraudulently transferred an interest in real property to Buch before she filed her bankruptcy petition on August 31, 2015, and seeking turnover of the transferred property pursuant to 11 U.S.C. §§ 544(a), 550, 551, and 548(a)(1)(A)(B).  Like the UST, Wetzel also seeks the denial of the debtor's discharge under § 727(a)(2)(A) and (a)(4)(A).  On February 8, 2016, and February 29, 2016, the debtor and Buch filed their respective answers to Wetzel's complaint.  At the parties' request, the Court consolidated the adversary proceedings for trial, which began on

---

[1]  The UST also filed a motion to dismiss the debtor's case but requested that the Court decide the adversary proceedings before setting the motion for hearing.

September 4, 2018, and concluded on September 5, 2018. Joseph A. DiPietro appeared on behalf of the UST; J. Brad Moore appeared on behalf of Wetzel; Donald K. Campbell, III appeared on behalf of the debtor; and Paul Buch appeared pro se. At the conclusion of the trial, the Court took the matters under advisement. For the reasons stated below, the Court denies the relief sought by the UST and Wetzel [referenced together as the trustees].

## Jurisdiction

The Court has jurisdiction over these matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and they are core proceedings under 28 U.S.C. § 157(b)(2)(E), (H), and (J). This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Background

The debtor and Buch have been a couple since December 2011. According to Buch, his relationship with the debtor has improved over the years but he does not wish to be married now or at any point in the future because he wants to live an autonomous life. Buch worked for large corporations early in his professional life but for the past twenty-plus years has made his living by buying farms and other properties, renovating them, selling them for a profit, and immediately reinvesting the proceeds into additional properties. When Buch met the debtor in 2011, he was running a 400-acre farm in Eureka Springs, Arkansas [the farm] that he had purchased in or around 2001 with cash.[2] The debtor graduated from medical school in 2009. She established Amy Garrison, M.D., PLLC [the PLLC] in 2011 and completed her residency in family medicine in June 2012. Her first post-residency job was as an emergency room physician in Batesville,

---

[2] It is Buch's practice to pay cash for his properties rather than finance them. He stated at trial that he retired from his corporate career to live a simple life and he is averse to carrying debt. Trial Tr. vol I, 27, Sept. 4, 2018; Trial Tr. vol II, 106, Sept. 5, 2018.

Arkansas.[3]  In May 2012, the debtor bought a home located at 110 Joe Baker Road in
Cushman, Arkansas [the Cushman property], a small town near Batesville, for
$209,000.00.  The debtor financed her purchase of the Cushman property through First
Community Bank.  On September 10, 2012, Buch paid off the debtor's outstanding
student loan debt of approximately $90,000.00, and the same day, the debtor signed an
informal agreement stating that she would repay Buch the full amount of the loan when
she was financially stable.  According to both Buch and the debtor, Buch's payment of
the debtor's student loan debt was a loan, not a gift.

Approximately six months after Buch loaned the debtor the money to pay off her student
loans, he hired real estate agent Kevin Lunceford [Lunceford] to look for commercial
properties in Greenbrier and Conway—Greenbrier because the debtor wanted to open a
medical practice there and Conway because Buch wanted to move closer to his elderly
parents.  At the beginning of April 2013, Lunceford told Buch about a piece of
commercial property located at 2645 Prince Street in Conway, Arkansas [the Prince
property] that would soon be listed for sale by Pam Macdowell Properties, where
Lunceford worked.  This particular property contained both office spaces and apartment
units.  Buch testified that he was told by Lunceford that the Prince Street property would
sell quickly once it hit the market.  In April 2013, Buch had approximately $2,000,000.00
in assets, including real estate worth $1,495,000.00 and an IRA account containing
$338,620.00, but he did not have sufficient liquid assets at his disposal to buy the Prince
Street property outright, which was his preference and historical practice.  Although
Buch was trying to sell his farm in Eureka Springs at the time, he was concerned that the
Prince Street property would no longer be on the market by the time he sold the farm.  As
a result, Buch took Lunceford's recommendation that Buch expedite his purchase of the

---

[3]  During medical school, the debtor participated in a financial assistance program
offered by the Arkansas Rural Medical Practice Student Loan and Scholarship Board that
provided tuition in exchange for the debtor's contractual agreement to practice medicine
in a qualifying rural area once she became a physician.  The debtor's job in Batesville
satisfied her obligation to work in a rural area.

Prince Street property by having the debtor help him obtain immediate financing.[4]

The debtor, who was still working in Batesville at the time and had regular income, agreed to co-sign a loan to facilitate Buch's purchase of the Prince Street property.  On April 15, 2013, the debtor and Buch applied for a loan with First Community Bank–the same bank that the debtor had used to finance her home in Cushman.  The loan application signed by both Buch and the debtor stated that the purchase price of the property was $240,000.00 and that title to the property was to be held by Paul Buch. UST Ex. 12.  The loan application also contained a note identifying an account at First Community Bank that would be the source of a 20% down payment of $48,000.00.  Both the account identified in the loan application and the funds in the account were Buch's; the debtor did not contribute any of her own money toward the down payment.  The day of the closing, May 13, 2013, Buch wired $50,109.97 (the down payment of $48,000.00 plus closing costs) from his account at First Community Bank to Faulkner Title Company, the title company handling the closing.  The "special instructions" section of the wire transfer form contained a note that identified the wired funds as "closing money for Paul Buch 2645 Prince Street, Conway, AR."  Def. Ex. 16.  Despite the loan application stating that Buch was to hold title to the Prince Street property, the seller deeded the property to both Buch and the debtor when the transaction closed on May 13,

_____

[4] Lunceford did not testify at trial despite the fact that the debtor had subpoenaed him to do so.  As a result of Lunceford's failure to appear, the parties agreed to treat his November 23, 2016 deposition transcript as his testimony for trial purposes.  Lunceford's deposition testimony supported Buch's recollection of events surrounding the purchase of the Prince Street property.  Specifically, Lunceford testified in his deposition that Buch contacted him to look for property in Conway around the first of April 2013, and that it was Lunceford's understanding that although Buch was the one buying the property, the financing would be in the debtor's name to allow for a quicker purchase.  Lunceford testified he believed that it would be easier for the debtor to obtain financing because she had a "cleaner portfolio" than Buch, who was trying to sell his farm in Eureka Springs at the time.  UST Ex. 29, p.1078-79.

4

2013.[5]  Beginning in May 2013, Buch paid every monthly mortgage payment of $1039.37 on the Prince Street property.

In June 2013, the debtor opened a rural "concierge" practice in Greenbrier, Arkansas.[6]  A few months later, her PLLC opened a weight-loss clinic called Hippocrates Health Concierge Family Medicine [Hippocrates Health], in one of the Prince Street property's office spaces.  In November 2013, the debtor worked her last shift at the Batesville emergency room and moved out of the Cushman property to reside with Buch in one of the Prince Street property's apartments.  The same month, the debtor's PLLC began paying Buch $500.00 each month to rent space in the Prince Street property for Hippocrates Health.[7]  Buch collected rent payments of roughly the same amount from other tenants.[8] All of the utilities for the Prince Street property were in Buch's name and were paid for by Buch.  In the months immediately following the purchase of the Prince Street property, Buch petitioned the City of Conway to rezone the property and paid the associated costs.  Buch communicated with a representative from an insurance company to obtain quotes for coverage on both the Prince Street property itself and the debtor's

---

[5]  The warranty deed for the Prince Street property states that the instrument was prepared by Graddy & Adkisson, LLP in Conway.  Because both the debtor and Buch testified to being unfamiliar with the names Graddy and Adkisson and Buch also testified that he used attorney Wade Williams in Eureka Springs to prepare documents for real estate transcations, the Court finds it more likely than not that the seller hired Graddy & Adkisson, LLP to prepare the deed that titled the Prince Street property in both Buch's and the debtor's names.

[6]  The debtor described her concierge practice as a cash-based practice in which she did not accept insurance but instead provided patient care for a monthly fee.  She later opened similar practices in Maumelle and Little Rock.  As of the date of trial, she had closed all of her office locations to run an online "virtual practice."  Trial Tr. vol I, 144.

[7]  The debtor's first check to Buch was written in December 2013 for $1000.00 and covered rent for November and December 2013.

[8]  At trial, the debtor introduced cancelled checks tendered to Buch by other tenants showing rent payments of $475.00, $500.00, and $425.00.  Def. Ex. 44.

medical practice inside the property, but the policies themselves were separate–Buch paid the premiums on the property itself and the debtor paid the premiums related to her medical practice.[9]  Buch spent roughly $50,000.00 on repairs and renovations to the Prince Street property.  The debtor did not contribute any of her own funds for those repairs and renovations but paid for items related specifically to her practice such as the Hippocrates Health sign for the outside of the building.  Buch paid the property taxes on the Prince Street property every year.  Def. Ex. 43.  Although the debtor claimed ownership of the Prince Street property on her 2013 tax return, she subsequently amended the return to remove that representation, stating on the return that she had incorrectly claimed an "office building rental property" in her original return on Schedule E.[10]  UST Ex. 41.  According to her amended return, disclaiming any ownership of the Prince Street property resulted in no change to the debtor's tax liability for 2013.  UST Ex. 41.  At trial, the debtor's attorney questioned her about how the amendment to her 2013 return came about:

> Q.  Okay.  Tell the Court what happened in the amendment of the tax return, the 2013 tax return; did you have a discussion with your CPA about it after the –
>
> A.  Yes.  He –he– when he saw that I was paying rent, he realized that the property was not mine.  That was an assumption that he made incorrectly.  And then he had to amend that.
>
> Q.  Okay.  So the only – the only amendment was to the 2013; you did not do it – carry that in '14 or '15, correct?
>
> A.  Correct.
>
> Q.  Okay.  And, of course, in '14 were – the filing of the '14 was before you filed your bankruptcy in '15?
>
> A.  Correct.

---

[9]  Buch was not employed by Hippocrates Health or the debtor's PLLC, but he testified that he sometimes helped the debtor with certain tasks associated with running her medical practice because he had a more flexible schedule than she and did not mind helping out.  Trial Tr. vol II, 19.  The debtor testified in her deposition on September 19, 2016, that Buch helped her with the administrative side of her practice but that she did not pay him to do so.  Both Buch and the debtor testified at trial that she pays Buch only to make the bone broth that she provides to her patients.

[10]  The debtor filed her amended 2013 tax return on May 16, 2016.

6

Q.      So you had corrected it at that point.

A.      Yes.

Trial Tr. vol II, 87.

On May 7, 2014, the debtor sold his Eureka Springs farm for $440,000.00 and used some of the proceeds to pay off the loan on the Prince Street property.  After Buch paid the loan in full, First Community Bank released its lien on the Prince Street property despite a cross-collateralization provision in the mortgage stating that the mortgage secured all other debts owed to the bank by Buch or the debtor.  UST Ex. 13.  After Buch satisfied the debt to First Community Bank, the debtor's PLLC continued to make monthly rent payments to Buch for four more months.  The debtor wrote the PLLC's last rent check to Buch in October 2014.  UST Ex. 39.  The same month, the debtor closed her Conway location to open a practice in Maumelle, Arkansas.

Buch testified that in early 2015, a couple that owned a restaurant across the street from the Prince Street property approached him and expressed interest in buying the Prince Street property.  While the couple never made a written offer to buy the property because they were unable to get financing, Buch testified that it was their interest in the property that precipitated his realization that the debtor's name was on the deed to the Prince Street property.  Trial Tr. vol II, 15-16.  Buch and the debtor both testified that their intent was always for the Prince Street property to be Buch's alone.  After Buch discovered that the Prince Street property was not titled solely in his name, he asked the debtor to execute a quitclaim deed that transferred her interest to him in order to clear up title to the property.  Trial Tr. vol I, 167-68.  The debtor executed the quitclaim deed on April 6, 2015, and the deed was filed of record two days later without transfer tax stamps.[11]  At trial, the debtor called Jim Pender [Pender] to testify as an expert in the area

_____

[11]  Under Arkansas law, when consideration is paid for a transfer of property, transfer tax stamps must be affixed to the deed to show the amount of consideration that changed hands.  See Ark. Code Ann. §§ 26-60-101 to -112.  However, transfer tax stamps are not required for transfers made "solely for the purpose of correcting or

7

of real estate transactions.  In addition to being a licensed attorney, Pender founded and owns First National Title.[12]  Pender testified that in the event a warranty deed is issued that is contrary to the intent of the parties as to ownership of the property, a quitclaim deed is an inexpensive method of cleaning up the resulting cloud on the title.  Trial Tr. vol II, 50.  He also testified that, under Arkansas law, if no consideration is paid for property, transfer tax stamps would not appear on the deed.  Trial Tr. vol II, 52.

Although the debtor had not resided in her home in Cushman since November 2013, she continued to make mortgage payments to First Community Bank until March 15, 2015. From November 2013 to March 2015, the debtor tried unsuccessfully to sell the Cushman property.  The debtor testified that she believes the property did not sell because the road leading to it–a road that was paved when the debtor bought the property but had subsequently been turned into a gravel road by the county–had fallen into such disrepair that it was sometimes impassable.  As a result, the pool of potential buyers for the Cushman property was limited to those with four-wheel drive vehicles.  According to the debtor, three of the eleven homes in her small neighborhood had already gone into foreclosure when she moved out of her home in November 2013.  On August 19, 2015, First Community Bank completed its foreclosure of the debtor's home in Cushman, resulting in the debtor owing a deficiency judgment of $53,941.15.

On August 31, 2015, the debtor filed a skeletal chapter 7 petition.  On September 14, 2015, she filed her schedules and her statement of financial affairs [SOFA].  Relevant to the matters before the Court are the debtor's initial responses to three questions–one in her SOFA and two in Schedule B.  Question 10 of the SOFA required the debtor to

---

replacing an instrument that has been previously recorded with full payment of the tax having been paid at the time of the previous recordation."  Ark. Code Ann. § 26-60-102(3).

[12]  Pender's title company acquired Faulkner Title Company the year after Faulkner Title Company handled the closing of the Prince Street property on  May 13, 2013.

> List all other property, other than property transferred in the ordinary
> course of the business or financial affairs of the debtor, transferred either
> absolutely or as security within **two years** immediately preceding the
> commencement of this case.

In response, the debtor marked the box labeled "None."  The trustees argue that the
debtor should have disclosed in response to Question 10 that she transferred her interest
in the Prince Street property to Buch on April 6, 2015.[13]  The debtor testified that she
never believed herself to own any part of the  Prince Street property because she did not
pay for it–Buch did.  She explained her initial failure to disclose the transfer on the
amended SOFA that she filed on September 3, 2018:

> On 04/08/15, the Debtor signed a quitclaim deed clearing up a cloud on
> the title of 2645 Prince Street, Conway, Arkansas.  Mr. Buch purchased
> the property, the legal title erroniously [sic] had debtor on the deed.  I had
> no equity ownership interest in the property.  I did not own an actual
> interest in the property.  I understood the Quitclaim Deed removed the
> mistake of legal title.  It may appear to be a transfer of interest but it is not
> an actual transfer of any financial interest in the property.

UST Ex. 6.


The instructions on Schedule B directed the debtor to "list personal property of the debtor
of whatever kind.  If the debtor has no property in one or more of the categories, place an
'x' in the appropriate position in the column labeled "None.'"  Question 2 on Schedule B
asked the debtor to describe and value

> Checking, savings, or other financial accounts, certificates of deposit, or
> shares in banks, savings and loan, thrift, building and loan, and homestead
> associations, or credit unions, brokerage houses, or cooperatives.

UST Ex. 4.  In response, the debtor listed a checking account at Bank of America with a
balance of $5888.00 and a business checking account for her PLLC at Bank of America
with a balance of $34.00.  However, the actual balance in the PLLC's checking account
on the date the debtor filed her petition was $26,607.00.  The debtor testified during her

---

[13]  The debtor signed the quitclaim deed on April 6, 2015, and the deed was
recorded on April 8, 2015.

September 16, 2016 deposition that $34.00 was not the correct balance for the PLLC's
account on the date that she filed her petition.  At trial, the debtor testified that she filled
out her schedules using an online form and that it was "very frustrating" because "it
would refresh automatically, all my data would disappear.  It wouldn't save the data."[14]
Trial. Tr. vol II, 83-84.  The debtor said that she thought that she had put down a different
balance for the PLLC account on her schedules and admitted–as she had done during her
deposition–that the $34.00 balance reflected on her original schedule B was not correct.
On her amended Schedule B filed on September 3, 2018, the debtor changed the value of
the account from $34.00 to $1.00 and described the account as

> Checking Account: business checking account (Amy Beard, MD, PLLC)
> net value of business includes checking account offset by business debts.
> Original Value used as marker, value of business included the value of
> company checking account less expenses.  Location: Bank of America.

UST Ex. 6.  On both her original and amended schedules, the debtor valued her business
interest at $20,000.00.  At trial, the debtor's attorney questioned Wetzel about the
interplay between the value of the debtor's interest in the PLLC and the balance in the
PLLC's checking account on the date that the debtor filed her individual chapter 7
petition:

> Q.   Okay.  The corporation did not file bankruptcy along with Ms. –
>      Ms. Beard, correct?
> A.   No.
> Q.   Okay.
> A.   Just her interest in the professional corporation would be included
>      within the bankruptcy.
> Q.   Right.  But that would only be the net interest, correct, not–
> A.   Well, not to put too fine a point on it, it would be the net – net
>      worth of the professional corporation.
> Q.   Correct.  And so, the cash in a checking account, in and of itself, if
>      there were outstanding credit card charges that had to be paid by
>      the PLLC, would deduct from the net value of that corporation,
>      would it not?
> A.   As a liability, yes.

---

[14]  Ostensibly, the "online form" referenced by the debtor was provided to her by
Mr. Campbell's office.

10

> Q. Okay. And so, the cash in hand doesn't necessarily correspond – the cash in the checking account doesn't necessarily automatically increase or decrease the value of the – of the corporation; is that correct?
>
> A. Well, it increases or decreases the value of the corporation depending on the amounts of the debits and credits to the account, so the net worth is going to fluctuate.

Trial Tr. vol I, 89-90.

> Q. Okay. And so, the cash available in the checking account would need to be offset by those debts to find out what the available cash, plus any other outstanding debts that the PLLC owed, correct?
>
> A. That would be correct.

Trial Tr. vol I, 91-92. On August 31, 2015, the PLLC had total outstanding credit card debt of $20,664.28, leaving an available balance of $5942.72 in the PLLC's account with which to pay employees and other business expenses. In response to her attorney's questions regarding what she intended to disclose about the PLLC's value, the debtor testified:

> Q. Okay. The net balance was what you intended to put into the value of the practice, correct?
>
> A. Yes.
>
> Q. Okay. Were you trying to hide any of this? You disclosed the checking account of the corporation, but the corporation was not filing bankruptcy, correct?
>
> A. Correct.

Trial Tr. vol II, 85.


Question 7 asked the debtor to list and value "Furs and jewelry." In response, the debtor put an "x" in the column labeled "None." However, on the date the debtor filed her petition, she owned a Tag Heuer watch gifted to her in 2007 by her former husband and some "small pieces of costume-like jewelry." Trial Tr. vol I, 86-87,141. When asked to explain why she did not disclose the watch on Schedule B, the debtor said that she did not consider watches to be jewelry–though she admitted that they do qualify as such–and she had not given any thought to the value of the watch or believed it to be valuable.

11

Trial Tr. vol II, 86-87.  In her amended schedules, the debtor added "Rings, Watch, Earrings" valued at $1200.00 to Schedule B and claimed an exemption of the same amount in her amended Schedule C.  The debtor admitted at trial that she testified at her § 341(a) meeting of creditors on October 15, 2015, that she had listed her assets and debts and that her original schedules and statements were true and correct.

The trustees contend that the debtor's discharge should be denied under § 727(a)(2) and § 727(a)(4) because of her failure to disclose her transfer of the Prince Street property to Buch, her failure to schedule her jewelry–specifically, the Tag Heuer watch–and her failure to schedule the correct balance for the PLLC's bank account.  In addition, Wetzel argues that the debtor fraudulently transferred her interest in the Prince Street property to Buch and that, as a result, Wetzel is entitled to recover the property for the benefit of the estate under § 548(a)(1)(A)(B).[15]  For the reasons stated below, the Court denies both complaints.

**Law & Analysis**

To resolve these two adversary proceedings, the Court  must decide the following: (1) whether the debtor fraudulently transferred the Prince Street property to Buch, entitling Wetzel to avoid the transfer and recover the value of the property for the benefit of the debtor's bankruptcy estate; and (2) whether the trustees' objections to the debtor's discharge should be sustained.  The Court will address Wetzel's fraudulent transfer allegations before moving to the trustees' shared contention that the debtor's discharge should be denied.

---

[15]  Wetzel also alleged in his complaint that the debtor had a "secret interest" in what was referenced by the parties at trial as the Skywood property–a property purchased entirely by Buch with a portion of the proceeds from the sale of his farm and sold to a third party prior to trial.  However, Wetzel did not dispute the debtor's attorney's assertion in closing argument that Wetzel had abandoned any alleged claim to the Skywood property and regardless, the Court finds that Wetzel did not prove that the debtor had an interest in the Skywood property.

## I. Fraudulent Transfer Allegations

The bankruptcy code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–(i) property; or (ii) an interest in  property." 11 U.S.C. § 101(54)(D).  A trustee may avoid a transfer of a debtor's interest in property under § 548 if the debtor made the transfer on or within two years before the date that the debtor filed bankruptcy if the debtor

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>    (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>    (III) intended to incur or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>    (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(A)(B).  Although the debtor characterized her execution of the quitclaim deed on April 6, 2015, as nothing more than a mechanism to clear up title to the Prince Street property for Buch, the Court finds that it was still a transfer of the debtor's interest in the property.  In addition, because the debtor signed the deed less than five months prior to filing her bankruptcy on August 31, 2015, the transfer falls within the two-year look-back period required under § 548.  The next question, then, is whether the interest that the debtor transferred to Buch would have been property of the estate had the debtor not transferred it.  *See Golden v. The Guardian* (*In re Lenox Healthcare, Inc.*), 343 B.R. 96, 100 (Bankr. D. Del. 2006) ("As a threshold matter, for a trustee to exercise

13

avoidance powers under [§ 548], there must have been a transfer of property of the estate.") (citing *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990) ("if the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated.")).

Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Although property of the estate is an expansive concept, it is not limitless:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). In other words, "where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest." *N.S. Garrott & Sons v. Union Planters Nat'l Bank* (*In re N.S. Garrott & Sons*), 772 F.2d 462, 466 (8th Cir. 1985). Despite "the broad scope of section 541(a), the Supreme Court noted that '[t]he legislative history indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title.'" *Id.* (citing *United States v. Whiting Pools, Inc*., 462 U.S. 198, 204 n.8 (1983)). Because bare legal title has no "tangible, economic value," a debtor's transfer of bare legal title does not constitute a fraudulent transfer and cannot be avoided under § 548. *Rodriquez v. Nelabovige* (*In re Kirst*), 559 B.R. 757, 763 (Bankr. D. Colo. 2016) (citing cases).

Therefore, before the Court proceeds further in its analysis under § 548, the Court must determine under Arkansas law whether the debtor held only bare legal title to the Prince Street property when she transferred her interest to Buch or whether she held a more significant interest. *See In re N.S. Garrott & Sons*, 772 F.2d at 466 ("Property rights under section 541 are defined by state law.") (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)). Under Arkansas law, a debtor may hold bare legal title as a result of a

resulting trust, which arises as a matter of law when "property is purchased in the name of one person with money furnished by another." *Cowden v. Ramsay* (*In re Cowden*), 154 B.R. 531, 534 n.3 (Bankr. E.D. Ark. 1993) (citing *Andres v. Andres*, 613 S.W.2d 404, 406 (Ark. Ct. App. 1981)). In a resulting trust, "a party becomes invested with legal title, but holds that title for the benefit of another." *In re Cowden*, 154 B.R. at 534 (citation omitted). A resulting trust is "founded upon the actual payment of money and upon no other ground." *Andres,* 613 S.W.2d at 406 (citing numerous cases). However, "when the parties involved are spouses or children of the one who pays the purchase price, the law presumes that the purchase and registration of legal title in the family members' names were intended as gifts by him to them since they are the natural objects of his affection and largess." *Walker v. Hooker*, 667 S.W.2d 637, 642 (Ark. 1984) (citation omitted). The presumption of a gift may be rebutted by evidence that the party who paid for the property did not intend the party with legal title to have a beneficial interest in the property. *Id*. Although the debtor and Buch are not married, the nature of their long-term romantic relationship may give rise to a similar presumption in this case. As a result, the Court will consider evidence of Buch's intent, including whether he had a reason to title the property in the debtor's name (other than to give her a gift); whether he managed the property; collected the rents; paid taxes and insurance; paid for repairs and improvements; or otherwise asserted ownership of the property. *See id*.

The Court found Buch credible when he testified that he asked the debtor to co-sign the loan with First Community Bank because he believed that the Prince Street property would be off the market before he could generate the funds from the sale of his farm to allow for a cash purchase. The Court also believes that Buch never intended for the debtor to share in his ownership of the property. In fact, the loan application–signed by both Buch and the debtor–clearly indicated that title to the property was to be held by only Buch. Further, the debtor contributed none of her own funds toward the purchase or improvement of the Prince Street property–she paid none of the closing costs, none of the sizeable down payment, and none of the renovation costs. Buch paid for all of those things plus incurred the cost associated with rezoning the property. Buch also paid the

15

insurance premiums on the Prince Street building, as well as the property taxes each year.[16]  In addition, Buch collected rent payments from the tenants of the Prince Street property–tenants that included the debtor's PLLC.  During the time that the debtor operated her PLLC d/b/a Hippocrates Health out of the Prince Street property, the PLLC paid rent to Buch in an amount that matched or closely approximated the amount of rent paid by Buch's other Prince Street tenants.  Although Wetzel argued that the PLLC's $500.00 monthly payments to Buch were really the debtor's half of the $1039.37 mortgage payment to First Community Bank simply disguised as rent payments, the evidence demonstrated that the PLLC's payments to Buch were actually rent.  The PLLC's monthly payments to Buch corresponded to the dates that the PLLC did business as Hippocrates Health at the Prince Street location.  Specifically, the debtor's rent payments to Buch began in November 2013–when she opened Hippocrates Health–despite the fact that Buch had begun making mortgage payments to First Community Bank in May 2013.  Likewise, the debtor continued to pay Buch rent for four months after he paid the debt to First Community Bank in full.  Had the debtor been paying half of the mortgage payments, the payments to Buch would have started in May 2013 when Buch bought the property and would have ended in June 2014 when Buch paid off the mortgage.

---

[16]  Although Buch always paid the property taxes on the Prince Street property, the debtor claimed ownership of the Prince Street property on her original 2013 income tax returns.  The debtor's prior statement to the IRS on her tax returns could have precluded  her from claiming that she does not own the property in the context of the current proceedings.  *See Amtrust, Inc. v. Larson*, 388 F.3d 594, 601 (8th Cir. 2004) ('"Quasi-estoppel' has been invoked by various courts to estop parties from asserting a position in judicial proceedings different than what was reported on their income tax returns.")  However, the Court finds that the application of quasi-estoppel is not appropriate in this case because the debtor received no tax benefit from claiming ownership of the Prince Street property on her original 2013 tax return–her tax liability did not change for 2013 when she amended the return to disclaim ownership of the property.  *See MSP Aviation, LLC v. Ashenfelter* (*In re MSP Aviation, LLC*), 531 B.R. 795, 810 (Bankr. D. Minn. 2015) (quasi-estoppel does not apply when no benefit was conferred by an incorrect statement on a tax return).

16

Based on the evidence discussed above, the Court finds that Buch paid for the Prince Street property without financial contribution from the debtor and did not intend to give the debtor a share of the property as a gift. Therefore, a resulting trust was established in favor of Buch and the debtor had only bare legal title to the property. As a result, the debtor had a duty to convey the property to the rightful owner, which she did on April 6, 2015. *See In re Cowden*, 154 B.R. at 534. For these reasons, the Court finds that Wetzel cannot avoid the debtor's transfer to Buch as fraudulent under § 548.[17]

## II. Objections to the Debtor's Discharge

Next, both trustees seek the denial of the debtor's discharge under § 727(a)(2) and (a)(4)(A). "The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor." *Manning v. Watkins* (*In re Watkins*), 474 B.R. 625, 630 (Bankr. N.D. Ind. 2012). Because the denial of a discharge is a "harsh and drastic penalty," the statute's provisions are "strictly construed in favor of the debtor." *Korte v. U.S. Internal Revenue Serv.* (*In re Korte*), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (internal citations omitted). Once a party objecting to a debtor's discharge "establishes a prima facie case, the burden then shifts to the debtor defendant to offer credible evidence to satisfactorily explain [her] conduct." *Robbins v. Haynes* (*In re Haynes*), 549 B.R. 677, 685 (Bankr. D.S.C. 2016). However, the objecting party bears the ultimate burden of proving by a preponderance of the evidence that a debtor is not entitled to a discharge. *In re Korte*, 262 B.R. at 471. In this case, the trustees must prove each element of § 727(a)(2) or (a)(4)(A) by a preponderance of the evidence in order to prevail upon their respective objections to the debtor's discharge.

### A. Section 727(a)(2)

Under  § 727(a)(2) the Court shall grant a debtor a discharge, unless–

---

[17] Because the Court finds that Wetzel is not entitled to avoid the transfer, his cause of action against Buch as the transferee under § 550 is denied as moot. Likewise, the Court denies the relief requested by Wetzel under § 551, which is not applicable in the absence of an avoided transfer.

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

    (A) property of the debtor, within one year before the date of the filing of the petition; or
    (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). Section 727(a)(2) is fundamental to the concept that a debtor's chapter 7 discharge is granted upon the condition that the debtor has disclosed all of her assets and made them available for distribution. *Helena Chem. Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 302 (Bankr. E.D. Ark. 2010). A creditor objecting to a debtor's discharge under § 727(a)(2) has the burden of proving four elements by a preponderance of the evidence–

(1) that the act complained of was done within one year prior to the date the petition was filed, or after the date the petition was filed;

(2) that the act was that of the debtor;

(3) that it consisted of a transfer, removal, destruction, or concealment of the debtor's property, or, if the act occurred after the date the petition was filed, the property of the estate; and

(4) that it was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate.

*See* 11 U.S.C. § 727(a)(2); *see also In re Korte*, 262 B.R. at 472.

The Court finds that the first three factors are present in this case–the debtor transferred property within the year prior to filing her petition and failed to disclose the transfer on her SOFA in response to Question 10.[18] *See Neary v. Stamat* (*In re Stamat*), 395 B.R. 59, 70 (Bankr. N.D. Ill. 2008) (for purposes of § 727(a)(2), concealment consists of "failing

---

[18] Both the UST's and Wetzel's complaints allege only one basis for denial of the debtor's discharge under § 727(a)(2)–her alleged concealment of the transfer of the Prince Street property to Buch.

or refusing" to disclose information to which creditors were entitled) (citation omitted).
The fourth factor under § 727(a)(2) requires a showing that the debtor acted with the
actual intent. *In re Korte*, 262 B.R. at 472. Constructive intent will not suffice. *Jacoway
v. Mathis* (*In re Mathis*), 258 B.R. 726, 733 (Bankr. W.D. Ark. 2000) (citing *Lovell v.
Mixon*, 719 F.2d 1373, 1377 (8th Cir. 1983)). Debtors rarely admit that they had the
requisite intent. *See In re Korte*, 262 B.R. at 472. Thus, the necessary intent may be
"'inferred from the facts and circumstances of the debtor's conduct.'" *Id*. at 472-73
(quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 590-91 (Bankr. D. Minn. 1987)).
Courts generally look to certain factors referenced as "badges of fraud" to determine
whether fraudulent intent exists. *In re Mathis*, 258 B.R. at 734. Badges of fraud include
whether:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred
> after the transfer:
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had
> been sued or threatened with suit;
> (5) the transfer was of substantially all of the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably
> equivalent to the value of the asset transferred or the amount of the
> obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer
> was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt
> was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor
> who transferred the assets to an insider of the debtor.

*Id.* (citing Ark. Code Ann. § 4-59-204(b)(1)-(11); *Brown v. Third Nat'l Bank* (*In re
Sherman*); 67 F.3d 1348, 1354 (8th Cir. 1995); *Graven v. Fink* (*In re Graven*), 936 F.2d
378, 383-84 n.8 (8th Cir. 1991); *United States v. Johnston*, 245 F.Supp. 433, 441 (W.D.
Ark. 1965)). A confluence of several badges of fraud "'can constitute conclusive
evidence of an actual intent to defraud.'" *In re Mathis*, 258 B.R. at 734 (quoting *In re
Sherman*, 67 F.3d at 1354). Section 101(31)(A) of the bankruptcy code provides that

(31) The term "insider" includes–
    (A) if the debtor is an individual–
        (i)  relative of the debtor or general partner of the debtor;
        (ii)  partnership in which the debtor is a general partner;
        (iii) general partner of the debtor; or
        (iv) corporation of which the debtor is a director, officer, or person in control[.]

11 U.S.C. § 101(31)(A).

The Court finds that the first badge of fraud is present in this case.  The debtor transferred property to Buch, whom she had been dating for approximately four years at the time of the transfer.  Although the Court recognizes that Buch and the debtor were not–and are not–married or otherwise related, the code's definition of an insider is not exclusive and the Court finds that the debtor's long-term committed relationship to Buch qualifies him as an insider in this case.[19]  *See In re Vu*, No. BKY 12-46862, 2013 WL 5442275, at *4 (Bankr. D. Minn. Sept. 30, 2013) (finding that debtor's transfer of property to her boyfriend of five years was a transfer to an insider).

The Court finds that the second badge of fraud is not present here because the debtor did not retain possession or control of the property after she transferred it to Buch.  In fact, she moved Hippocrates Health out of the Prince Street property in October 2014–six months prior to transferring her interest in the property to Buch.

The Court's determination of the third badge of fraud–whether the transfer was disclosed or concealed–is mixed.  The debtor failed to disclose her transfer of the Prince Street property when she filed bankruptcy, meaning that the transfer was initially concealed from the UST, Wetzel, and the debtor's creditors.  However,  First Community Bank–the

---

[19]  Although the Court found Buch sincere when he repeatedly asserted at trial that he has no desire to wed at any point in his life, he and the debtor have sometimes worn wedding rings and otherwise held themselves out to the public as a married couple, allegedly to mollify Buch's conservative father.

creditor holding the debt that led to the debtor's bankruptcy filing–knew that the Prince Street property would be titled in only Buch's name because the loan application that the bank approved specifically stated that very thing.[20]  As a result, it does not appear that the debtor's transfer of title to Buch concealed anything substantive from First Community Bank in the light of the fact that the bank believed that Buch was already the sole titleholder.

The Court finds that the fourth badge is not present here.  Although the debtor made her last mortgage payment on the Cushman property in March 2015, she had not yet defaulted on her obligation to First Community Bank when she transferred her interest in the Prince Street property to Buch and had not been sued or threatened with suit at the time.

The Court also finds that the fifth badge is not present in this case.  The debtor transferred bare legal title to Buch and, as the Court stated above in its discussion of § 548, bare legal title has no economic value.  As a result, the debtor's transfer of an asset with no value was not a transfer of substantially all of her assets.

The Court finds that the sixth badge of fraud is not present in this case because the debtor did not abscond.

The Court finds that the seventh badge is present.  Although there is no evidence that the debtor removed assets, she concealed her Tag Heuer watch and other jewelry when she failed to list them in her original schedules.  However, the Court does not assign the

---

[20]  In addition, once Buch had paid off the mortgage on the Prince Street property, First Community Bank released its lien despite cross-collateralization language in the loan documents that would have allowed the bank to retain a lien on the Prince Street property until the debtor's mortgage on the Cushman property was also satisfied.  The fact that the bank did not exercise that right is some additional evidence that it considered the debtor's role in the Prince Street deal to be minimal.

presence of this particular badge much weight due to the plausibility of the debtor's explanation for her initial omission of the items–the watch was a gift she received in 2007 from her ex-husband that she did not, at the time she filled out her schedules, consider "jewelry" and the rest of her jewelry was costume.

The Court finds that the eighth badge is not present in this case.  The debtor transferred her valueless interest in the Prince Street property to Buch and received nothing in exchange.  Therefore, the Court finds that the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.  *See Kapila v. Moodie* (*In re Moodie*), 362 B.R. 554, 562 (Bankr. S.D. Fla. 2007) (transferring bare legal title for free is reasonably equivalent value).

The Court finds that the ninth badge of fraud is not present.  There is no evidence to suggest that the debtor was insolvent on the date she transferred her interest in the Prince Street property to Buch and the Court finds that she could not have become insolvent as a result of transferring bare legal title that had no economic value.  *See id.* at 563 (transferring a valueless asset has "no effect on solvency either positively or negatively.")

The Court finds that the tenth badge is present.  The debtor transferred her interest to Buch shortly before she stopped making mortgage payments to First Community Bank on the Cushman property, leading the bank to foreclose and resulting in the debtor owing a $53,941.15 deficiency judgment.  The Court finds that the eleventh badge, which relates to a transfer of business assets, is not applicable in this case.

After examining the circumstances surrounding the debtor's transfer of her interest in the Prince Street property to Buch, including the badges of fraud discussed above, the Court finds that the evidence fails to establish that the debtor made the transfer with the actual intent to defraud a creditor or her bankruptcy estate.  Therefore, the Court finds that the trustees failed to carry their respective burdens of proof under § 727(a)(2) and denies the relief requested pursuant to that subsection in both complaints.

## B.  Section 727(a)(4)(A)

Section 727(a)(4)(A) provides for the denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4)(A).  A party objecting to a debtor's discharge under (a)(4)(A) has the burden of proving by a preponderance of the evidence that–

> (1) the debtor made the statement under oath;

> (2) the statement was false;

> (3) the statement was made with fraudulent intent;

> (4) the debtor knew the statement was false; and

> (5) the statement related materially to the debtor's bankruptcy.

*In re Richmond*, 429 B.R. at 307.

The first and second elements under § 727(a)(4)(A) require that the debtor made a false statement under oath.  "For purposes of § 727(a)(4), a debtor's petition and schedules, statement of financial affairs, statements made at a § 341 meeting and testimony at a Rule 2004 examination all constitute statements that are made under oath." *In re Stamat*, 395 B.R. at 73.  Like all debtors, the debtor in this case verified her schedules and statements under the penalty of perjury.  *See  Daniel v. Boyd* (*In re Boyd*), 347 B.R. 349, 355 (Bankr. W.D. Ark. 2006).  In addition, she testified under oath at her § 341(a) meeting that she had read and signed her schedules and statements and they were true and correct. She also confirmed under oath at her § 341(a) meeting that she had listed all of her assets and debts.  The debtor's declarations regarding her schedules and statements have the "force and effect of an oath." *Id*. at 355 (citing *Cepelak v. Sears* (*In re Sears*), 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)).  Based on the fact that the debtor initially failed to list her jewelry, the correct balance in the PLLC's bank account, and the transfer of the Prince Street property on her schedules and  SOFA but made oaths to the contrary, the Court finds that the first two elements under § 727(a)(4)(A) are satisfied.[21]

_____

[21]  The fact that the debtor filed amended schedules on September 3, 2018, does not negate the fact that the debtor's original schedules and statements were inaccurate.

Before discussing the third and fourth elements, the Court will address the fifth element under § 727(a)(4)(A)–whether the statements related materially to the debtor's bankruptcy. "A false statement is material if it 'bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of [her] property.'" *In re Mathis*, 258 B.R. at 736 (quoting *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992)). "It is not the debtor's responsibility to decide which assets are to be disclosed to creditors; rather [her] job is simply to address each question and answer it accurately and completely[.]" *In re Stamat*, 395 B.R. at 73 (citing *Clean Cut Tree Serv., Inc. v. Costello* (*In re Costello*), 299 B.R. 882, 889 (Bankr. N.D. Ill. 2003)). "The value of the undisclosed asset does not determine whether the subject matter of the false oath was material and failure to disclose an asset with minimal value may be material." *Lincoln Savings Bank v. Freese* (*In re Freese*), 460 B.R. 733, 739 (B.A.P. 8th Cir. 2011). Likewise, whether an asset could be claimed as exempt is not determinative of materiality. *See Mertz v. Rott*, 955 F.2d at 598.

Here, the debtor failed to disclose in her initial schedules that she owned a Tag Heuer watch and other jewelry; she failed to disclose that she had transferred her interest in the Prince Street property to Buch on April 6, 2015; and she misstated the balance of the PLLC's bank account on the date she filed her individual bankruptcy case. The Court finds that the debtor's failure to disclose that she owned a watch and other jewelry in her initial schedules was a material misstatement regarding the debtor's assets–irrespective of whether those assets could be–and later were–claimed as exempt.

Likewise, the Court finds that the debtor's failure to disclose her transfer of the Prince Street property to Buch was a material misstatement. Even if the debtor believed that her transfer to Buch was meaningless to her estate because he was the true owner of the property and the quitclaim deed was only a means of clearing the title, she had a

---

*See Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382 (5th Cir. 2001).

responsibility to answer Question 10 of her SOFA accurately, end of story.  Although the
Court has now determined that the debtor held and transferred only bare legal title to the
Prince Street property, the Court's ruling on that issue does not retroactively absolve the
debtor from the duty she had on the date she filed her SOFA to disclose every transfer
that she had made within two years of the date she filed her petition–regardless of
whether she subjectively believed the information to be material or not.  Although the
transfer disposed of an interest in property that the debtor's creditors could not have
reached, it was nonetheless material and should have been disclosed.  *See In re Freese*,
460 B.R. at 739.

The trustees also argue that the debtor made a material misstatement when she
understated the balance of the PLLC's bank account as of the date she filed her
individual bankruptcy petition.  However, the Court finds that this particular
misstatement was not material to the debtor's bankruptcy case,  Although the PLLC is
owned by the debtor–as she disclosed elsewhere on Schedule B–the PLLC itself is not in
bankruptcy and the debtor was not required to separately list the PLLC's bank account,
even if she occasionally used the account to pay personal expenses.  *See In re Watkins*,
474 B.R. at 644 (finding that an individual debtor was not required to disclose the
existence of a corporate account); *see also Brown v. Smith* (*In re Smith*), 489 B.R. 875,
895 (a statement about an asset that is not the debtor's "does not relate materially to the
bankruptcy case.").

The third and fourth elements under § 727(a)(4)(A) require that the debtor knew that her
statements were false and had fraudulent intent.  Whether the debtor had the requisite
knowledge and intent under § 727(a)(4)(A) is a matter of fact.  *In re Sears*, 246 B.R. at
347 (citing *Palatine Nat'l Bank v. Olson* (*In re Olson*), 916 F.2d 481, 484 (8th Cir.
1990)).  As with § 727(a)(2), fraudulent intent under (a)(4) may also be "inferred from
the facts and circumstances of the debtor's conduct."  *In re Korte*, 262 B.R. at 472-73
(quoting *In re Schmit*, 71 B.R. at 590).  Even if a debtor is merely careless, the
"'cumulative effect of all the falsehoods together evidences a pattern of reckless and

25

cavalier disregard for the truth [to support] fraudulent intent."' *In re Sholdra*, 249 F.3d at 383 (quoting *Economy Brick Sales, Inc. v. Gonday* (*In re Gonday*), 27 B.R. 428, 432 (Bankr. La. 1983)).  Although the debtor made two false, material statements under oath when she failed to disclose her jewelry and failed to disclose the transfer of her interest in the Prince Street property to Buch, the Court finds that the trustees failed to prove by a preponderance of the evidence that the debtor did so with the fraudulent intent required under § 727(a)(4)(A), for the reasons stated above in the Court's discussion of intent under § 727(a)(2).  *See McDermott v. Capra* (*In re Capra*), No. 16-1010, 2016 WL 5106994, at *10 (Bankr. N.D. Ohio Sept. 19, 2016) (analysis of fraudulent intent is essentially identical under § 727(a)(2) and (a)(4)).  Therefore, the Court finds that the trustees failed to carry their burdens of proof under § 727(a)(4)(A) and denies the relief requested pursuant to that subsection in both complaints.

**Conclusion**

For the above stated reasons, the Court denies the relief requested in the UST's and Wetzel's respective complaints and will schedule the UST's motion to dismiss for hearing by subsequent notice.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:  12/04/2018

cc:    Donald K. Campbell, III, attorney for the debtor
       J. Brad Moore, attorney for chapter 7 trustee
       Joseph A. DiPietro, attorney for United States Trustee
       Paul M. Buch, defendant
       Frederick S. Wetzel, III, chapter 7 trustee
       United States Trustee

26